UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

RON KLOSOWSKI,

                    Plaintiff,                          Case No. 15-10636

v                                        Honorable Thomas L. Ludington

JOE LEDESMA, et al.,

                    Defendants.

_____/

**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT**

      Plaintiff Ronald Klosowski performed bridge tending services for Defendant Bay City from 2007 to 2012 through numerous employment agencies of which he was an employee. Mot. for Summ. J. Ex. K 36-37, ECF No. 10 ("Klosowski Dep."). After disagreeing with his supervisor, Defendant Joe Ledesma, about the bridge tenders' 2012 winter schedule, Klosowski wrote an email to the Bay City mayor on November 14, 2012. In his email, Klosowski expressed concern with "unnecessary money" being expended by the City to staff the bridges during the month of December. One week later, on November 21, 2012, Defendant Ledesma contacted Klosowski's employment agency to advise that Bay City was not selecting Klosowski to return as a bridge tender for the 2013 year.

      Klosowski responded by filing suit in Bay County Circuit Court on September 10, 2013. Defendants then removed the action to this Court on February 19, 2015. ECF No. 1. After completing discovery, on November 24, 2015 Defendants filed a motion for summary judgment as to all of Plaintiff's claims. ECF No. 10. For the reasons discussed below, that motion will be granted in part and denied in part.

## I.

Plaintiff Klosowski was hired by a staffing agency called SelectStaffing in 2007. *See* Klosowski Dep. 36-37.  His first and only assignment from SelectStaffing was to perform bridge tending services for Defendant Bay City.  *Id*. at 38-41. Over the next five years, Bay City went through "six or seven different staffing companies".  *Id*. at 31.  When the staffing company changed, the bridge tenders simply signed contracts with the new staffing agency and continued to provide bridge tending services for the City. *Id*.

## A.

At the time of the events in question, in late 2012, Klosowski was employed by a staffing company called ITH Staffing ("ITH"). *Id*. at 30.  Klosowski acknowledged receiving ITH's handbook on July 28, 2011. Mot. for Summ. J. Ex. C.  Through signing the acknowledgment, Klosowski recognized that his employment with ITH was at-will and could be terminated at any time, with or without notice. *Id*. Plaintiff Klosowski also signed a copy of ITH's policies and procedures, acknowledging:

> I understand that I am an employee of this staffing company and only I or this staffing company can terminate my employment.  When an assignment ends, I must report to staffing company office for my next job assignment.  Failure to do so or accept my next job assignment will indicate that I have voluntarily quit and will not be eligible for unemployment benefits.

Mot. for Summ. J. Ex. B. Susan Schalk, the ITH employee in charge of handling benefits and workers' compensation, states in her affidavit that Bay City contracted with ITH for temporary, seasonal bridge tenders. Mot. for Summ. J. Ex. B.

Once ITH took over as Klosowski's employer, it became responsible for paying wages, workers compensation insurance, and other employee benefits. *Id*. ITH also managed employee sick time and leave pursuant to the Family and Medical Leave Act. *Id*. While ITH controlled the

ministerial functions of Klosowski's employment, his day-to-day activities and responsibilities were controlled by Defendant Bay City, through Defendant Ledesma.  Ledesma set the bridge tenders' schedules, hours, and assignments, was responsible for supervising, disciplining, and evaluating bridge tenders, and was ultimately responsible for requesting or rejecting bridge tending personnel at the end of each season.  Resp. to Summ. J. Ex. 4A 8-13, ECF No. 14 ("Ledesma Dep.").

Over his five years serving as a bridge tender, Plaintiff Klosowski had some minor personality conflicts with fellow bridge tenders. Klosowski did not get along with fellow bridge tender Tim Holt, who often smoked in the small control room and did not clean up his ashtrays, upsetting Klosowski's asthma. Klosowski Dep. at 80-81.  Klosowski also complained that Mr. Holt often parked in a no-parking zone, and that Mr. Holt damaged the control room when he eventually left.  *Id*. at 198-99.   Klosowski also did not always get along with Tom Fick, who did not compensate Klosowski for a television, cable, and kitchen items that Klosowski decided to purchase for the bridge tenders use, as Fick claimed that he did not use those items. Klosowski Dep. at 82-83.  Ledesma and Klosowski also had some personal issues, since Klosowski thought he was improperly trained and unable to fix anything on the bridge. *Id*. at 210-211.

Ledesma was also occasionally concerned with Klosowski's interactions with the public. On one occasion when a freighter was approaching the bridge cars continued to drive on the bridge despite the fact that they had a red light. *Id*. at 217.  Klosowski began slowly, manually bringing the gate down in an attempt to stop the car.  *Id*. at 218.  Ledesma felt that this action presented a safety issue for the public, while Klosowski believed that the greater safety issue was the potential that the freighter could hit the bridge before it was open. *Id*. In a September 7, 2011 merit evaluation, Ledesma gave Klosowski generally high scores, but noted that although

Klosowski took his job seriously, he "needs to be understanding with employees and public." Resp. to Summ. J. Ex. 8. Then in a December 16, 2011 merit evaluation, Ledesma noted that he and Klosowski had had some issues in June, but that they had been resolved, and that "Ron is clearly one of our best employees." Resp. to Summ. J. Ex. 9.

On August 9, 2012 and again on September 27, 2012, just prior to the incidents underlying this case, Ledesma gave Klosowski scores of 100 percent in his merit evaluations. Resp. to Summ. J. Ex. 6-7. Notably, those reviews included 100 percent scores in the categories of "Personality" and "Cooperation/Teamwork."

## B.

While in previous years bridges were unmanned from December 15 to March 15, in 2012 the United States Army Corp of Engineers amended the bridge schedule. Under the new schedule, bridges were to be manned beginning on March 1 and ending on December 31. Upon learning of the new bridge schedule, Klosowski complained to Ledesma that paying bridge tenders to do nothing except "watch[ ] the water freeze" in December was a waste of the City's money. Resp. to Summ. J. Ex. A, Klosowski Affidavit. Klosowski also stated that staffing the bridges during that time was costing Bay City in excess of $25,000 per year. *Id*. According to Klosowski, Ledesma "just said no." *Id*. Defendants claim that Klosowski was not actually concerned with City expenses, but instead did not like working in the cold, did not like shoveling snow, and wanted to vacation in December.

At the time in question Ledesma's supervisor, Tony Rytlewski, had just retired, so Klosowski was unable to address his concerns to him. *See* Klosowski Dep. 262. Klosowski also chose not to take his concerns to the City Manager. *Id*. Instead, Klosowski called the mayor to discuss the bridge schedule. *Id*. at 263. The mayor asked Klosowski to send him an email

- 4 -

discussing his concerns. Accordingly, on November 13, 2012 Klosowski sent the mayor the
following email:

> Hi Mr. Shannon, this is Ron with the concern about the unnecessary money being
> spent for the month of December. Four people on each bridge at $480.00 per
> person that's $15,360.00 minimum, also holiday money just to watch water
> freeze. Plus all the heat and lights you have to have on. I have been there going
> on my 5th year, and if we had two openings total you would be lucky. Last year
> we had one freighter on dec. 2nd, that was it, they get stuck out in the bay. I love
> my job and I don't want this to affect it, but it don't make any sense at all, when
> the City is trying to save money. On days, Joe L and Jim can open it if need be,
> just get with Coast Guard and have the ship give a 12 hour notice, like they did in
> past years, and if need be, call one of us in, with the 12 hour notice we could
> come in, on call. I don't know for the life of me why they would change it. It
> used to be march 15th to dec. 15th and that was to long. We don't have openings
> until around the 10th of april, and all pleasure craft are done by say late oct, early
> nov. I like money like anyone else, but Chris I like to earn in. This is wasting our
> money, and I don't like wasting money, yours or mine
> Thanks Ron Klosowski... If you got time please let me know what you think

Mot for Summ J. Ex. K (sics in original). The mayor forwarded Klosowski's email to Robert
Bellman, the City Manager that same day, who in turn emailed David Harran, Mr. Rytlewski's
replacement as Bay City's public work's director. Resp. to Summ. J. Ex. 13 at 4, 12. Mr.
Bellman asked Mr. Harran "could the City achieve these savings if recommendations are
implemented?" Resp. to Summ. J. Ex. 12.

The day after Klosowski sent his email to the mayor, November 14, 2012, Ledesma and
Mr. Harran visited Klosowski on the bridge. According to Plaintiff, Mr. Harran informed
Klosowski that he had good ideas but that it was too late for any changes that year. Mr. Harran
also allegedly informed Klosowski that he did not have a problem with the fact that Klosowski
went to the mayor, but that Ledesma did.

Some who worked with Klosowski on the bridges also had a problem with Klosowski's
email to the mayor. Numerous fellow bridge tenders became upset that Klosowski was
apparently speaking on their behalf. Mot. for Summ. J. Ex. H. They also expressed concern that

their hours would be reduced and they would potentially have to seek additional employment. *Id.* Some even discussed circulating a petition to remove Klosowoski from his bridge tender position. *Id.*

On November 20, 2012 Mr. Harran answered Mr. Bellman's email, explaining that Bay City was required to follow the schedule as specified in the Federal Register, Rules and Regulations, and that the City would be subject to fines and penalties if it was unresponsive to any bridge opening request. Resp. to Summ. J. Ex. 15.  Mr. Harran further informed Mr. Bellman that he had informed Klosowski of these facts the day before. *Id.*

On November 21, 2012, one week after Klosowski emailed the mayor, Ledesma contacted ITH to advise that Klosowski was not being asked back for the 2013 year.  In a report of the call, Carla Sowel stated that Ledesma did not want Klosowski to return for the next season because Klosowski had contacted the mayor regarding the bridge schedule, which Klosowski was only interested in because he did not like working in December.  Mot. for Summ. J. Ex. M. ITH was informed that Ledesma and Mr. Harran had a "fire to put out" because the bridge schedule is ruled by the Coast Guard and the city "could lose control of the bridge" and that "they are so upset with him for doing this because all he had to do was ask his supervisors about why they run the bridges in December." *Id.* The report also noted that the Mayor was looking into whether the State could take control of the bridges. *Id.*

Meanwhile, Mr. Harran sent a second email to Mr. Bellman on December 1, 2012, noting that the City could save up to $25,000, but could be subject to $25,000 in fines from the Coast Guard. Resp. to Summ. J. Ex. 16.  Mr. Harran further noted that he agreed with Mr. Bellman that they should bring the topic of discussion to the forefront, and that they could consider closing the bridges for the months of November and April as well. *Id.*

**C.**

Klosowski was apparently not notified that he would not be asked to return for the 2013 season.  Instead, in a December 12, 2012 job assignment memorandum, Ledesma stated that all bridge operators, including Klosowski, would be off until April 1, 2013. *See* Resp. to Summ. J. Ex. 23.  The memorandum further stated that "[a] Bridge Department staff meeting is scheduled for March 25, 2013 at 8:00 a.m. at the City Service Building (lunch room). All Bridge Personnel are required to attend."

On March 13, 2013 Ms. Sowel documented that she had left a voicemail message for Klosowski to call ITH.  Mot. for Summ. J. Ex. M.  Klosowski apparently did not return the call, and, pursuant to the December 12, 2012 memorandum, Klosowski reported to the meeting on March 25, 2013.  Ledesma then asked Klosowski if he could speak with him outside, and informed Klosowski that he no longer had a job.  Klosowski Dep. 294.  Klosowski stated that he wanted to talk to Mr. Harran, which Ledesma told him he could not do. *Id*. at 295. Nonetheless, Klosowski went to talk to Mr. Harran, who told Klosowski that he would check into and get back to him. *Id*. Later that day, Ledesma called Klosowski to inform him that he was no longer a bridge operator because he could not get along with other bridge tenders. *Id*. at 298.  ITH did not inform Klosowski that he did not have a job until that same day, March 25, 2013.  Mot. for Summ. J. Ex. M.  Ms. Sowel informed Klosowski that he was not being asked back because there had been a cut back in hours and Bay City requested people who would be willing to work fewer hours. *Id*.

Following the end of his bridge tending services to Bay City, Klosowski did not report to ITH for another assignment. Klosowski Dep. 184-190; Mot. for Summ. J. Ex O.  At the time of his deposition on June 30, 2014 Klosowski was looking for work, but was not using any

employment agencies to assist him in his search, claiming that he no longer trusted them. *Id.* at 126.

## D.

Klosowski filed suit against Defendants in Bay County Circuit Court on September 10, 2013, alleging three counts: (1) tortious interference with an advantageous business relationship; (2) tortious interference with a contractual relationship; and (3) violation of Michigan public policy and the Michigan Constitution's guarantees of freedom of speech. ECF No. 1. Ex. B. Klosowski then filed an amended complaint on February 16, 2015, adding a claim that Defendants violated his right to freedom of speech under 42 U.S.C. § 1983. Defendants consequently removed the action to this Court on February 19, 2015.

## II.

Defendants now move for summary judgment on all of Klosowski's claims. A motion for summary judgment should be granted if the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party has the initial burden of identifying where to look in the record for evidence "which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The burden then shifts to the opposing party who must set out specific facts showing "a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (citation omitted).

The Court must view the evidence and draw all reasonable inferences in favor of the non-movant and determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251-52. The party opposing summary judgment "must do more than simply show that there

- 8 -

is some metaphysical doubt as to the material facts…. Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

## A.

Klosowski's federal claim under 42 U.S.C. § 1983 will be addressed first. Section 1983 provides in relevant part:

> "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress."

*Id.* In the fourth count of his amended complaint, Klosowski alleges that Defendants violated § 1983 by retaliating against him for exercising his right to freedom of speech and expression as protected by the First Amendment of the United States Constitution. Compl. ¶¶ 74-75.

To establish a claim under § 1983 a "plaintiff must establish both that 1) []he was deprived of a right secured by the Constitution or laws of the United States and 2) the deprivation was caused by a person acting under color of state law." *Redding v. St. Eward*, 241 F.3d 530, 532 (6th Cir. 2001). A public employee bringing a First Amendment retaliation claim under § 1983 must demonstrate:

> (1) he engaged in constitutionally protected speech or conduct;
>
> (2) an adverse action was taken against him that would deter a person of ordinary firmness from continuing to engage in that conduct; and
>
> (3) the adverse action was motivated at least in part by his protected conduct.

*See Scarbrough v. Morgan Cty. Bd. of Educ.*, 470 F.3d 250, 255 (6th Cir. 2006). If a plaintiff satisfies these three elements, then the burden shifts to the defendant to establish, by a

preponderance of the evidence, that it would have acted the same even absent the plaintiff's protected activity.

**i.**

Defendants first challenge Klosowski's standing to assert a First Amendment retaliation claim.  While courts apply a relaxed approach to standing in First Amendment cases, a plaintiff still bears the burden of establishing this basic constitutional requirement. *Fieger v. Michigan Supreme Court,* 553 F.3d 955, 961 (6th Cir. 2009). To satisfy the Constitution's standing requirement, a party must establish:

> (1) he or she has suffered an "injury in fact" that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.,* 528 U.S. 167, 180–81, (2000).

Both parties recognize the Supreme Court's decision in *Board of County Commissioners, Wabaunsee County v. Umbehr*, 518 U.S. 668 (1996), holding that the Pickering balancing test applies to independent contractors as well as employees. *Id.* at 684-86 (recognizing "the right of independent government contractors not to be terminated for exercising their First Amendment Rights).  Defendants, however, argue that Klosowski does not have standing to bring his claim because he is neither a public employee nor an independent contractor of Defendant Bay City performing services under an existing contract.

In support of their argument Defendants first emphasize *Duran v. City of Corpus Christi*, 240 F.App'x 639 (5th Cir. 2007).  There, the plaintiff, Duran, was hired as an independent contractor for a private entity, Entrust, to serve as its local health plan coordinator. *Id.* at 640. The City of Corpus Christi awarded Entrust a contract to provide third-party claims administration and accounting services related to its health insurance program, and Entrust

selected Duran to serve as a local coordinator.  *Id*. At some point Duran informed the City of potential problems related to an insurance claim made by an adult child of an employee, and leaked information regarding the disputed claim to a local newspaper. *Id*.  Subsequently, following the expiration of the contract, the city decided not to award Entrust the contract for the following term, and instead awarded the contract to a competitor. *Id*. at 641.  Duran then filed suit, alleging that the City violated § 1983 by not awarding the contract to Entrust in retaliation for his protected speech regarding the adult child's claim. *Id.*  The Fifth Circuit Court of Appeals found that Durand, as an independent contractor of Entrust, which was in turn an independent contractor of the City, did not have standing to bring a derivative claim on behalf of Entrust because he had not suffered his own injury in fact.  *Id*. at 642.   Defendants cite a number of additional cases in this vein.  *See Garzez v. Lopez*, 281 F. App'x 323 (5th Cir. 2008) (holding that the agent of an independent contractor did not have standing to assert an injury resulting from the school board terminating its contract with the agency for which the agent worked); *Potthoff v. Morin,* 245 F.3d 710, 716 (8th Cir. 2001) (holding that a shareholder could not assert an injury arising from the city's termination of a leasing agreement with his wholly owned corporation).

As Plaintiff notes, the cases cited by Defendants are distinguishable from the present facts, where Bay City did not terminate its relationship with ITH, but only with Plaintiff Klosowski.  Klosowski therefore is not asserting harm that results from a third party's injury.  Instead, Klosowski is asserting his own injury in fact – that he himself was not selected as a bridge tender in retaliation for his protected speech.

Defendants also point to *Housey v. McNeal*, 2006 WL 1047013 (E.D. Mich. 2006).  There, the district court held that a disappointed bidder could not bring suit against the

government where there was no pre-existing relationship between the contractor and the government. *Id*. at *3. *Housey* is distinguishable from the present case, since it is undisputed that Plaintiff Klosowski had an pre-existing relationship with Defendant Bay City and had provided bridge tending services to Defendant Bay City for over five years.

The remaining cases cited by Defendants do not present any issues of standing. *See Webb v. Kentucky State University*, 468 F.App'x 515 (6th Cir. 2012) (holding that a university's decision not to award a professor tenure or to renew her one year contract was not adverse action that would likely chill a person of ordinary firmness from continuing to engage in that activity); *Sartaine v. Pennington*, 244 F. App'x 718, 719 (6th Cir. 2007) (holding *Umbehr* inapplicable to a case in which a waste management company and its owner filed suit against County officials for failing to renew their contract where the contract had expired, there was no right of renewal, and the county fiscal court was required by state law to accept bids for a new contract).

In a sense, Klosowski's employment arrangement is the opposite of the independent contractor arrangement present in *Umbehr*. While Umbehr was compensated by the government, the government had no right to supervise or control the details of how Umbehr's work was done. Here, in contrast, Klosowski received no pay or benefits from Bay City, but Bay City controlled the day-to-day details of his job including hours, scheduling, and discipline. *See* Ledemsa Dep. 13-15. Bay City also controlled whether Klosowski returned to his temporary position as a bridge tender each season.

In *Braswell v. Haywood Reg'l Med. Ctr.*, 234 F. App'x 47 (4th Cir. 2007), the Fourth Circuit determined that a staff doctor must be treated as a public employee in analyzing his First Amendment claim. *Id*. at 53. The Fourth Circuit reasoned that the plaintiff staff attorney at the public hospital had reciprocal obligations, and that "[i]n return for the privilege to use the

- 12 -

Hospital's facilities, staff doctors are required to be on call for certain periods each month and help with various administrative functions. Staff doctors consult with other doctors and assist in performing surgeries, and hospitals may be held jointly and severally liable for their tortious conduct." *Id.* The Court also reasoned that "a patient admitted to the emergency room would not know the difference between staff doctors and doctors on the hospital payroll." *Id.*

*Vollette v. Watson*, 937 F. Supp. 2d 706 (E.D. Va. 2013) also presents a comparable case. There, although the plaintiffs were directly employed by either "Aramark" (a food services company) or "Correct Care Solutions" (a medical services company), the plaintiffs regularly worked in a city jail. *Id.* at 710. One year after the sheriff required the contractors to undergo strip searches, the contractors filed suit. The sheriff then revoked the plaintiffs' jail security clearance the following business day, which led the plaintiffs to amend their complaints to add claims that the revocation of their security clearances violated their First Amendment right to free speech under § 1983. *Id.* at 711-712. The district court concluded that the plaintiffs were "public employees" for the purposes of their First Amendment retaliation claims. *Id.* at 721.

Here, although Klosowski was directly employed by a staffing agency, Klosowski provided bridge tending services for Defendant Bay City for five years. When Bay City switched staffing agencies it simply had Klosowski sign employment contracts with the new agency. *See* Klosowski Dep. 30-37. Furthermore, Defendant Bay City, through Defendant Joe Ledesma, controlled most of the day-to-day functions of Klosowski's employment, including his schedule, hours, discipline, and performance reviews. Accordingly, Klosowski will be treated as a public employee for purposes of his § 1983 claim.

**ii.**

Defendants next argue that Klosowski has not shown that he was engaged in constitutionally protected speech or conduct under the first prong of *Pickering*.  "While public employees may not be required to sacrifice their First Amendment free speech rights in order to obtain or continue their employment, a state is afforded greater leeway to control speech that threatens to undermine the state's ability to perform its legitimate functions." *Rodgers v. Banks*, 344 F.3d 587, 596 (6th Cir.2003) (internal citations omitted).  Therefore, in the case of governmental employees, a plaintiff must establish that: (1) his speech touched on matters of public concern; and (2) his interest in commenting on the matter of public concern outweighs the city's interest in promoting the efficiency of the public service it performs through its employees. *See Cockrel v. Shelby County School Dist.*, 270 F.3d 1036, 1048 (6th Cir. 2001); *Pickering v. Board of Ed. Of Tp. High School Dist. 205 Will County, Ill.*, 391 U.S. 563 (1968).

**a.**

Speech that touches on matters of public concern has been defined by the Supreme Court as "speech relating to any matter of political, social, or other concern to the community." *Dye*, 702 F.3d at 295 (quoting *Connick*, 461 U.S. at 146). The Supreme Court has held that when a public employee speaks as an employee upon matters of personal interest instead of as a citizen upon matters of public concern "absent the most unusual circumstance, a federal court is not the appropriate forum in which to review the wisdom of a personnel decision taken by a public agency allegedly in reaction to the employee's behavior." *Connick*, 461 U.S. at 147.  This is based on the premise "that while the First Amendment invests public employees with certain rights, it does not empower them to constitutionalize the employee grievance." *Garcetti*, 547 U.S. at 420 (internal quotation and citation omitted).  "Instead, "[w]hether an employee's speech

- 14 -

addresses a matter of public concern must be determined by the content, form, and context of a given statement, as revealed by the whole record." *Connick*, 461 U.S. at 147-48.

Defendants argue that Klosowski was not speaking on matters of public concern in his email to the mayor because he was primarily concerned with his own winter employment schedule. Klosowski's subjective motivations are not dispositive of the issue. As explained by the Sixth Circuit, "[t]he employee's motive for engaging in the speech in question is a relevant, but not dispositive, factor when considering whether an employee's expression is of public concern." *Farhat v. Jopke*, 370 F.3d 580, 590-91 (6th Cir. 2004). "[T]he pertinent question is not *why* the employee spoke, but *what* he said." *Id*. at 591. Here, the "focus," "point," or "communicative purpose" of Klosowski's speech was to inform the Mayor of his belief that the City was expending unnecessary funds in staffing the bridges in the month of December. *See* Mot. for Summ. J. Ex. K ("Hi Mr. Shannon, this is Ron with the concern about the unnecessary money being spent for the month of December [sic]. … This is wasting our money and I don't like wasting money, yours or mine[.]")

Defendants also argue that Klosowski was mistaken in his statements to the mayor, insofar as the bridge schedule was regulated by the Army Corp of Engineers and Bay City would be subject to fines if it did not follow the pre-established schedule. As explained in *Pickering* however, the fact that a speaker speaks erroneously does not remove his or her statements from the purview of First Amendment protections. *Pickering*, 391 U.S. at 572. As in *Pickering*, Defendants could easily have rebutted Klosowski's omission in their own statements to the mayor. Absent a showing that Klosowski knowingly or recklessly made false statements, an error or omission in his statement to the mayor is irrelevant to the First Amendment analysis. *Id*. 574-75.

- 15 -

Next, Defendants argue that Klosowski's statements did not sufficiently touch on a matter of public concern because Klosowski was speaking as an employee, not a citizen. As explained by the Supreme Court in *Garcetti*, "[s]o long as employees are speaking as citizens about matters of public concern, they must face only those speech restrictions that are necessary for their employers to operate efficiently and effectively." *Garcetti*, 547 U.S. at 419.

Plaintiff Klosowski argues that *Pickering* is analogous to his case. In *Pickering* a public high school teacher sent a letter to a local newspaper criticizing the way in which the Board of Education and superintendent had handled past proposals to raise revenue for the schools. *Pickering*, 391 U.S. at 564. The teacher was then dismissed after the Board of Education determined that the publication of the letter was "detrimental to the efficient operation and administration of the schools of the district...." *Id.* In finding that the teacher's statements constituted protected First Amendment speech, the Supreme Court held as follows:

> [T]he question whether a school system requires additional funds is a matter of legitimate public concern on which the judgment of the school administration, including the School Board, cannot, in a society that leaves such questions to popular vote, be taken as conclusive. On such a question free and open debate is vital to informed decision-making by the electorate. Teachers are, as a class, the members of a community most likely to have informed and definite opinions as to how funds allotted to the operations of the schools should be spent. Accordingly, it is essential that they be able to speak out freely on such questions without fear of retaliatory dismissal.

*Id.* at 571-72. Klosowski argues that he, as a bridge tender, was the member of the community most likely to have informed and definite opinions as to bridge schedules. He also argues that his statements were made for the public good and against his own economic interests.

Defendants argue that *Garcetti* is a more analogous case. *Garcetti*, 547 U.S. at 421. There the plaintiff served as a calendar deputy district attorney for the Los Angeles County District Attorney's Office. *Id.* at 414. After determining that an affidavit used to obtain a critical search

- 16 -

warrant contained numerous errors and misrepresentations, the plaintiff wrote a memorandum to his supervisors explaining the errors and recommending dismissal of the case. *Id*. at 414. The plaintiff claimed that as a result of the memorandum he was subject to a series of retaliatory employment actions, and he eventually filed suit under § 1983. The Supreme Court concluded that the plaintiff was speaking as an employee, not as a citizen. The controlling factor, according to the Court was that the plaintiff's "expressions were made pursuant to his duties as a calendar deputy" who's responsibilities included the duty to "advise his supervisor about how best to proceed with a pending case …." *Id*. at 421. Despite this holding, the Court specifically held that "[t]he First Amendment protects some expressions related to the speaker's job." *Id*. at 419. This was in recognition of the importance of "promoting the public's interest in receiving the well-informed views of government employees engaging in civic discussion." *Id*. The Court further held that the fact that a plaintiff "expressed his views inside his office, rather than publicly, is not dispositive." *Id*. at 420.

The present case lies somewhere in between *Pickering* and *Garcetti*. On the one hand, there is some evidence that Klosowski believed the Mayor was in his chain-of-command, and Klosowski posed at least one work-related solution to a scheduling problem. On the other hand, writing to the mayor regarding the bridge schedule was not in Klosowski's official, day-to-day professional duties as a bridge tender. Moreover, in his email Klosowski primarily raised taxpayer concerns such as potential municipal waste. *See Rodgers v. Banks*, 344 F.3d 587, 597 (6th Cir. 2003) (holding that "the employee's entire speech does not have to focus on matters of public concern, as long as some portion of the speech does so."). Klosowski's e-mail accordingly "bore similarities to letters submitted by numerous citizens every day." *Garcetti*, 547 U.S. at 422. Because Klosowski wrote to the mayor primarily as a taxpaying citizen with special

- 17 -

knowledge of the bridge schedule – not pursuant to any official job duty – his statements touch on a matter of public concern. *See Czurlanis v. Albanese*, 721 F.2d 98, 104 (3d Cir. 1983) (concluding that a plaintiff "spoke as a concerned citizen and taxpayer and not as an aggrieved employee" in protesting wasted taxpayer money and alleged deficiencies in record keeping at a public meeting of the Union County Board of Chosen Freeholders).

### b.

To proceed in his § 1983 claim Klosowski must also establish that his interest in commenting on the matter of public concern outweighs the City's interest in promoting the efficacy and efficiency of its bridge services. *See Cockrel*, 270 F.3d at 1048; *Pickering*, 391 U.S. at 568. As explained by the Sixth Circuit:

> In order to justify a restriction on speech of public concern by a public employee, plaintiff's speech must impair discipline by superiors, have a detrimental impact on close working relationships, undermine a legitimate goal or mission of the employer, impede the performance of the speaker's duties, or impair harmony among co-workers. The state bears the burden of showing a legitimate justification for discipline.

*Meyers v. City of Cincinnati*, 934 F.2d 726 (6th Cir.1991). Relevant factors in this regard include "the manner, time, and place of the employee's expression," as well as "the context in which the dispute arose." *Rankin*, 483 U.S. at 388, 107 S.Ct. 2891. Defendants bear the burden of demonstrating that such legitimate grounds existed to justify the termination. *Connick*, 461 U.S. at 150.

Here, the expression was an email sent to the mayor after Klosowski unsuccessfully raised scheduling concerns with Defendant Ledesma. Defendants argue that Klosowski's communication to the mayor impacted working relationships, undermined the employer's goal of complying with the navigational schedule implemented by regulation through the Army Corp of Engineers, and impaired harmony among co-workers. Defendants also suggest that Klosowski's

interest in communicating with the mayor was slight, because his direct supervisor, Joe Ledema, had already resolved any scheduling issues. Klosowski counters that his speech was actually consistent with Bay City's interests in effectively managing its bridge schedules and reducing costs. He argues that this is evidenced by the fact that Bay City adopted some of his suggestions, such as removing Ledesma from Friday coverage on the bridge, and the fact that city personnel initially suggested expanding his proposals.

Defendants are incorrect in their assertion that Klosowski's actions impaired Bay City's goal of complying with the navigational schedule implemented by regulation through the Army Corp of Engineers. Klosowski's email to the mayor was a scheduling suggestion that was never adopted by the City. It therefore had no effect on Bay City's compliance with federal regulations. Defendants are also incorrect in their assertion that Defendant Ledesma had already resolved the scheduling issues raised by Klosowski, as the fact that Klosowski's supervisor disagreed with his protected speech does not outweigh Klosowski's First Amendment right to petition his local government.

Defendants have provided evidence that Klosowski's e-mail caused disharmony between Klosowski and Defendant Ledesma, as well as between Klosowski and his co-workers. Specifically, Defendants argue that Klosowski's co-workers became concerned about their potential loss of December hours, and that some discussed circulating a petition asking management not to return Klosowski for the next season. *See* Mot. for Summ. J. Ex. H. As explained by the Fifth Circuit, "[t]he First Amendment balancing test [of *Pickering* ] can hardly be *controlled* by a finding that disruption did occur." *Porter v. Califano*, 592 F.2d 770, 773–74 (5th Cir.1979) (emphasis in original). Instead, the Court must balance the disruption or disharmony with the speech at issue. *Id.* Defendants have presented no evidence that

Klosowski's email disrupted the efficient functioning of the bridges.  It is also unclear to what extent Ledesma was responsible for adding to this disharmony.  Furthermore, Klosowski's is correct with regard to his claim that his email was consistent with Bay City's interest in maintaining the bridges in a cost-efficient manner and avoiding tax-payer waste.  Viewing all of the facts in a light most favorable to Plaintiff Klosowski, Defendants have not demonstrated a state interest that outweighs Klosowski's First Amendment right to speak on matters of public concern.

### iii.

In their motion for summary judgment, Defendants do not challenge Plaintiff Klosowski's § 1983 claims on the second or third prong of *Pickering*.  Accordingly, those issues are not addressed. Defendants do argue that Defendant Ledesma is entitled to qualified immunity. Under 42 U.S.C. § 1983, Government officials are immune from civil liability "when performing discretionary duties, provided 'their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Whitney v. City of Milan*, 677 F.3d 292, 296 (6th Cir. 2012) (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  In determining whether a government official enjoys qualified immunity for a particular act, courts must apply a two-prong test: "(1) we inquire whether the facts, viewed in the light most favorable to the nonmoving party, show the officer's conduct violated a constitutional right; and (2) if so, then we determine whether the constitutional right was clearly established by asking whether a reasonable official would understand that what he is doing violates that right. *Whitney*, 677 F.3d at 296 (citing *Saucier v. Katz*, 533 U.S. 194, 201–02 (2001)). "A right is clearly established if the contours of the right are sufficiently clear so that a reasonable officer would have understood, under the circumstances at hand, that his behavior violated the right."

*Bailey v. Kennedy*, 349 F.3d 731, 741 (4th Cir.2003) (internal quotation marks and alteration omitted). In other words, "existing precedent must have placed the statutory or constitutional question ... beyond debate." *Occupy Nashville v. Haslam*, 769 F.3d 434, 443 (6th Cir. 2014) (quoting *Plumhoff v. Rickard*, 134 S.Ct. 2012, 2023 (2014).

The above analysis demonstrates that the first prong is satisfied. Therefore, the question becomes whether the constitutional right was clearly established by asking whether a reasonable official would understand that what he is doing violates that right. *Saucier*, 533 U.S. at 202.

There is no doubt that public employees may not be fired on a basis that infringes their First Amendment Rights. Furthermore, the Supreme Court has held that government actors "may not deny a benefit to a person on a basis that infringes on his constitutionally protected freedom of speech even if he has no entitlement to that benefit." *Umbehr,* 518 U.S. at (internal citations and quotation omitted). However, broad principles are not dispositive at this stage of the analysis, where the right at issue must be defined narrowly, focusing on "the crucial question whether the official acted reasonably in the particular circumstances that he or she faced." *Plumhoff*, 134 S.Ct. at 2023. The question therefore becomes whether a reasonable government official would have known that Klosowski's email to the mayor regarding bridge scheduling issues, outside the normal chain of command, touched on a matter of public concern, and whether consequently not asking Klosowski back as a bridge tender for the next year violated his First Amendment right.

Ledesma's decision lands in a grey area for two reasons: first because Ledesma could have perceived that Klosowski was speaking as an (uninformed) employee instead of a citizen; and second because Ledesma did not terminate Klosowski's emploment, but merely chose not to ask him back after his temporary term had expired. Because "[o]fficials are not liable for bad

guesses in gray areas" Ledesma is entitled qualified immunity on Klosowski's First Amendment claim. *Campbell v. Galloway,* 483 F.3d 258, 272 (4th Cir. 2007). Klosowski's § 1983 claim against Defendant Ledesma will be dismissed.

**B.**

Because Klosowski's federal § 1983 claim against the city survives summary judgment, this Court properly retains jurisdiction over Klosowski's state law claims. In his amended complaint, Klosowski raises two tort claims against Defendant Bay City and Defendant Ledesma. Klosowski asserts that Defendants' conduct constitutes tortious interference with an advantageous business relationship and tortious interference with a contractual relationship. Specifically, he argues that Ledesma's conduct constituted tortious interference with his at-will relationship with Bay City.

**i.**

Defendants first argue that Klosowski's tort claims against Defendant Bay City must be dismissed because under the Governmental Tort Liability Act Bay City is immune from tort liability while engaged in the exercise or discharge of governmental functions. M.C.L. 691.1407(1). Klosowski does not contest Defendants' claims in his response. Accordingly Klosowski's tort claims will be dismissed as to Defendant Bay City.

**ii.**

Defendants also argue that Klosowski's tort claims against Defendant Joe Ledesma should be dismissed for four reasons: (1) Defendant Ledesma is immune from tort liability; (2) Klosowski was not party to and did not suffer a breach of contract; (3) Klosowski did not suffer a breach or termination of a business expectancy; and (4) Ledesma did not intentionally or

wrongfully induce or cause a breach of a third-party business relationship.  These arguments will be addressed in turn.

### a.

Defendants first argue that Klosowski's intentional tort claims against Defendant Ledesma should be dismissed because Ledesma is immune from tort liability. As explained by the Michigan Supreme Court in *Odom v. Wayne County,* 482 Mich. 459 (Mich. 2008), party seeking to invoke individual governmental immunity for intentional torts must establish the following:

> (a) The acts were undertaken during the course of employment and the employee was acting, or reasonably believed that he was acting, within the scope of his authority,
>
> (b) the acts were undertaken in good faith, or were not undertaken with malice, and
>
> (c) the acts were discretionary, as opposed to ministerial.

*Id*.

The parties dispute whether the good faith element is satisfied. The Michigan Supreme Court has defined as "'malicious intent, capricious action or corrupt conduct' or 'willful and corrupt misconduct.'" *Id*. at 474 (citing *Amperse v. Winslow*, 75 Mich. 234, 245 (Mich. 1889). Defendants argue that Klosowski has not presented any evidence that Ledesma did not act in good faith in deciding not to select Klosowski as a bridge tender for the 2013 season. Defendants further argue that Ledesma made the decision for the legitimate reason of replacing full time bridge tenders with part time bridge tenders.  Klosowski disagrees, arguing that the record suggests Ledesma did not act in good faith.  Klosowski emphasizes testimony and documents suggesting that Ledesma misrepresented the timing of his decision, misrepresented Klosowski's interpersonal work record, and chose not to select Klosowski based on a personal grievance – specifically that he was angry at Klosowski for bringing his concerns to the mayor.

Taking all facts in a light most favorable to Klosowski, the question of whether Ledesma acted in good faith is a material dispute of fact.

**b.**

Defendants next argue that Ledesma cannot be liable for tortious interference with a contractual relationship because Klosowski was not party to and did not suffer a breach of contract. Klosowski argues that Ledesma tortuously interfered with his at-will contract with Bay City. To proceed on a claim of tortious interference with a contractual relationship, a plaintiff must establish three elements: "(1) the existence of a contract, (2) a breach of the contract, and (3) an unjustified instigation of the breach by the defendant." *Health Call of Detroit v. Atrium Home & Health Care Servs., Inc.,* 706 N.W.2d 843, 849 (Mich. 2005). Because it is undisputed that Klosowski was informed that he qualified for other assignments through ITH and chose not to return to ITH for a subsequent assignment, Klosowski cannot as a matter of law proceed in his claim that Ledesma tortuously interfered with his contractual relationship with ITH. The fact that Klosowski was not asked to return as a bridge tender had no bearing on his ability to continue his relationship with ITH.

**c.**

Defendants also move to dismiss Klosowski's claim of tortious interference with a business expectancy. The elements of tortious interference with a business relationship or expectancy are "(1) the existence of a valid business relationship or expectancy that is not necessarily predicated on an enforceable contract, (2) knowledge of the relationship or expectancy on the part of the defendant interferer, (3) an intentional interference by the defendant inducing or causing a breach or termination of the relationship or expectancy, and (4)

resulting damage to the party whose relationship or expectancy was disrupted.  *Health Call of Detroit*, 706 N.W.2d at 849.

In his complaint Klosowski alleges that "Joe Ledesma intentionally interfered with the advantageous business relationship of the Plaintiff with ITH and caused his termination not for the benefit of Bay City, but for his own personal motivation including but not limited to anger, retaliation and jealousy." Compl. ¶ 51.  Defendants argue that Ledesma did not induce or cause a termination of the relationship or expectancy, as Plaintiff himself chose not to report to ITH for assignments after he was not asked back as a bridge tender.  Because it is undisputed that Klosowski was informed that he qualified for other assignments through ITH and chose not to return to ITH for a subsequent assignment, he cannot proceed in his claim that Ledesma tortuously interfered with his business relationship with ITH.[1]  Klosowski Dep. 184-190; Mot. for Summ. J. Ex O.  The fact that Bay City did not ask Klosowski to return had no bearing on Klosowski's ability to continue his relationship with ITH.

### C.

Finally Defendants move to dismiss Klosowski's claim that their actions were in violation of Michigan public policy and the Michigan constitution's guarantee of freedom of speech. Defendants argue that Klosowski has no remedy under the Michigan Constitution and that the facts alleged by Klosowski do not support a violation of Michigan public policy.

### i.

In his complaint, Klosowski alleges that Defendants' conduct violated Article 1, § 5 of the Michigan Constitution, which provides that, "[e]very person may freely speak, write, express and publish his views on all subjects… and no law shall be enacted to restrain or abridge the

---

[1] Klosowski suggests in his response that Ledesma could be held liable for tortuously interfering with his relationship with Bay City.   Klosowski makes no allegation that Ledesma interfered with his relationship with Bay City in his complaint, and so this argument will not be addressed.

liberty of speech or of the press."  Defendants argue that *Jones v. Powell*, 462 Mich. 329 (Mich. 2000) precludes such a claim.

In *Jones*, the Michigan Supreme Court held that there was no inferred damage remedy available "for a violation of the Michigan Constitution in an action against a municipality or an individual government employee." *Id.* at 335. The Court explained that because municipalities and their employees are not protected by 11th Amendment immunity, plaintiffs are able to seek damages against them under § 1983.  *Id.* The Court concluded that, because the plaintiffs had an available remedy under § 1983, plaintiffs could not seek damages for alleged violations of the Michigan Constitution.  *Id. See also Trakhtenberg v. Oakland Cty.*, 2015 WL 6449327, at *23 (E.D. Mich. Oct. 26, 2015) ("Accordingly, under *Jones*, Plaintiff cannot seek damages for an alleged violation of the Michigan Constitution because other potential avenues of relief – § 1983 claims and state-law tort claims – exist."); *Evans v. Wayne Cty.*, 2011 WL 5546230, at *12 (E.D. Mich. Nov. 10, 2011) ("Because another avenue of relief is available to obtain damages from the county and its officials, under *Jones*, Plaintiff's state constitutional claims are barred."). Because Klosowski has an available remedy under § 1983 against municipality Bay City and its employee, Ledesma, pursuant to *Jones* he has no remedy under the Michigan state constitution. His state constitution claim will therefore be dismissed.

**ii.**

Defendants also argue that Klosowski has not established a violation of Michigan public policy claim.  As explained by the Michigan Supreme Court, "in the absence of a contractual basis for holding otherwise, either party to an employment contract for an indefinite term may terminate it at any time for any, or no, reason." *Suchodolski v. Michigan Consol. Gas Co.*, 316 N.W.2d 710, 711 (Mich. 1982). However, "an employer is not free to discharge an employee at

will when the reason for the discharge contravenes public policy." *McNeil v. Charlevoix Cty.*, 772 N.W.2d 18, 24 (Mich. 2009). To state a claim that an employee's at-will discharge violates Michigan public policy, a plaintiff must allege one of the following: "(1) the employee is discharged in violation of an explicit legislative statement prohibiting discharge of employees who act in accordance with a statutory right or duty; (2) the employee is discharged for the failure or refusal to violate the law in the course of employment; or (3) the employee is discharged for exercising a right conferred by a well-established legislative enactment." *Id.*

Plaintiff Klosowski alleges in his complaint that there is "a strong public policy regarding freedom of speech about issues of Municipal waste as guaranteed by the Michigan Constitution." Klosowski has identified no legislative-enactments aside from the Michigan state constitution in support of his public policy claim. The Michigan Supreme Court has explained that "[a] public policy claim is sustainable…only where there also is not an applicable statutory prohibition against discharge in retaliation for the conduct at issue. *Dudewicz v. Norris-Schmid, Inc.*, 503 N.W.2d 645, 650 (Mich. 1993) disapproved of on other grounds by *Brown v. Mayor of Detroit*, 734 N.W.2d 514 (2007)). Because § 1983 provides a statutory remedy for Plaintiff, as discussed above, Klosowski's public policy claim must be dismissed.

## III.

Accordingly, it is **ORDERED** that Defendants' motion for summary judgment, ECF No. 10, is **GRANTED IN PART AND DENIED IN PART.**

It is further **ORDERED** that counts I-III of Plaintiff Klosowski's amended complaint, ECF No. 1, are **DISMISSED with prejudice.**

- 27 -

It is further **ORDERED** that count IV of Plaintiff Klosowski's amended complaint, ECF No. 1, is **DISMISSED with prejudice** as to Defendant Joe Ledesma only.  Count IV survives as to Defendant Bay City.

s/Thomas L. Ludington
THOMAS L. LUDINGTON
United States District Judge

Dated: February 17, 2016

---

PROOF OF SERVICE

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on February 17, 2016.

s/Johnetta Curry
JOHNETTA CURRY
Acting Case Manager