UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

RON KLOSOWSKI,

                      Plaintiff,                          Case No. 15-10636

v                                          Honorable Thomas L. Ludington

JOE LEDESMA, et al.,

                      Defendants.

_____/

**ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

      Plaintiff Ronald Klosowski performed bridge tending services for Defendant Bay City from 2007 to 2012 through numerous employment agencies of which he was an employee. Mot. for Summ. J. Ex. K 36-37, ECF No. 10 ("Klosowski Dep.").  After disagreeing with his supervisor, Defendant Joe Ledesma, about the bridge tenders' 2012 winter schedule, Klosowski wrote an email to the Bay City mayor on November 14, 2012.  In his email, Klosowski expressed concern with "unnecessary money" being expended by the City to staff the bridges during the month of December.  One week later, on November 21, 2012, Defendant Ledesma contacted Klosowski's employment agency to advise that Bay City was not selecting Klosowski to return as a bridge tender for the 2013 year.

      Klosowski responded by filing suit in Bay County Circuit Court on September 10, 2013. Defendants then removed the action to this Court on February 19, 2015.  ECF No. 1.  After completing discovery, on November 24, 2015 Defendants filed a motion for summary judgment as to all of Plaintiff's claims. ECF No. 10.  Defendant's motion was granted in part, and all of Plaintiff's claims were dismissed with the exception of his 42 U.S.C. § 1983 claim against Defendant Bay City.  The § 1983 claim against Defendant Bay City survived because

Defendants had raised no arguments challenging that claim.  Defendant Bay City then obtained permission to file a second motion for summary judgment, which was filed on April 4, 2016. *See* Mot. for Summ. J. II, ECF No. 30.  Defendant's motion will now be granted.

## I.

The relevant facts as set forth in this Court's previous order have not changed, and are set forth again.  Plaintiff Klosowski was hired by a staffing agency called SelectStaffing in 2007. *See* Klosowski Dep. 36-37.  His first and only assignment from SelectStaffing was to perform bridge tending services for Defendant Bay City.  *Id*. at 38-41. Over the next five years, Bay City went through "six or seven different staffing companies".  *Id*. at 31.  When the staffing company changed, the bridge tenders simply signed contracts with the new staffing agency and continued to provide bridge tending services for the City. *Id*.

## A.

At the time of the events in question, in late 2012, Klosowski was employed by a staffing company called ITH Staffing ("ITH").  *Id*. at 30.  Klosowski acknowledged receiving ITH's handbook on July 28, 2011. Mot. for Summ. J. Ex. C.  Through signing the acknowledgment, Klosowski recognized that his employment with ITH was at-will and could be terminated at any time, with or without notice. *Id*. Plaintiff Klosowski also signed a copy of ITH's policies and procedures, acknowledging:

> I understand that I am an employee of this staffing company and only I or this staffing company can terminate my employment.  When an assignment ends, I must report to staffing company office for my next job assignment.  Failure to do so or accept my next job assignment will indicate that I have voluntarily quit and will not be eligible for unemployment benefits.

Mot. for Summ. J. Ex. B. Susan Schalk, the ITH employee in charge of handling benefits and workers' compensation, states in her affidavit that Bay City contracted with ITH for temporary, seasonal bridge tenders. Mot. for Summ. J. Ex. B.

Once ITH took over as Klosowski's employer, it became responsible for paying wages, workers compensation insurance, and other employee benefits. *Id*. ITH also managed employee sick time and leave pursuant to the Family and Medical Leave Act. *Id*. While ITH controlled the ministerial functions of Klosowski's employment, his day-to-day activities and responsibilities were controlled by Defendant Bay City, through Defendant Ledesma. Ledesma set the bridge tenders' schedules, hours, and assignments, was responsible for supervising, disciplining, and evaluating bridge tenders, and was ultimately responsible for requesting or rejecting bridge tending personnel at the end of each season. Resp. to Summ. J. Ex. 4A 8-13, ECF No. 14 ("Ledesma Dep.").

Over his five years serving as a bridge tender, Plaintiff Klosowski had some minor personality conflicts with fellow bridge tenders. Klosowski did not get along with fellow bridge tender Tim Holt, who often smoked in the small control room and did not clean up his ashtrays, upsetting Klosowski's asthma. Klosowski Dep. at 80-81. Klosowski also complained that Mr. Holt often parked in a no-parking zone, and that Mr. Holt damaged the control room when he eventually left. *Id*. at 198-99. Klosowski also did not always get along with Tom Fick, who did not compensate Klosowski for a television, cable, and kitchen items that Klosowski decided to purchase for the bridge tenders use, as Fick claimed that he did not use those items. Klosowski Dep. at 82-83. Ledesma and Klosowski also had some personal issues, since Klosowski thought he was improperly trained and unable to fix anything on the bridge. *Id*. at 210-211.

Ledesma was also occasionally concerned with Klosowski's interactions with the public. On one occasion when a freighter was approaching the bridge cars continued to drive on the bridge despite the fact that they had a red light. *Id*. at 217. Klosowski began slowly, manually bringing the gate down in an attempt to stop the car. *Id*. at 218. Ledesma felt that this action presented a safety issue for the public, while Klosowski believed that the greater safety issue was the potential that the freighter could hit the bridge before it was open. *Id*. In a September 7, 2011 merit evaluation, Ledesma gave Klosowski generally high scores, but noted that although Klosowski took his job seriously, he "needs to be understanding with employees and public." Resp. to Summ. J. Ex. 8. Then in a December 16, 2011 merit evaluation, Ledesma noted that he and Klosowski had had some issues in June, but that they had been resolved, and that "Ron is clearly one of our best employees." Resp. to Summ. J. Ex. 9.

On August 9, 2012 and again on September 27, 2012, just prior to the incidents underlying this case, Ledesma gave Klosowski scores of 100 percent in his merit evaluations. Resp. to Summ. J. Ex. 6-7. Notably, those reviews included 100 percent scores in the categories of "Personality" and "Cooperation/Teamwork."

**B.**

While in previous years bridges were unmanned from December 15 to March 15, in 2012 the United States Army Corp of Engineers amended the bridge schedule. Under the new schedule, bridges were to be manned beginning on March 1 and ending on December 31. Upon learning of the new bridge schedule, Klosowski complained to Ledesma that paying bridge tenders to do nothing except "watch[ ] the water freeze" in December was a waste of the City's money. Resp. to Summ. J. Ex. A, Klosowski Affidavit. Klosowski also stated that staffing the bridges during that time was costing Bay City in excess of $25,000 per year. *Id*. According to

Klosowski, Ledesma "just said no." *Id*.  Defendants claim that Klosowski was not actually concerned with City expenses, but instead did not like working in the cold, did not like shoveling snow, and wanted to vacation in December.

At the time in question Ledesma's supervisor, Tony Rytlewski, had just retired, so Klosowski was unable to address his concerns to him. *See* Klosowski Dep. 262.  Klosowski also chose not to take his concerns to the City Manager.  *Id*.  Instead, Klosowski called the mayor to discuss the bridge schedule.  *Id*. at 263.  The mayor asked Klosowski to send him an email discussing his concerns.  Accordingly, on November 13, 2012 Klosowski sent the mayor the following email:

> Hi Mr. Shannon, this is Ron with the concern about the unnecessary money being spent for the month of December.  Four people on each bridge at $480.00 per person that's $15,360.00 minimum, also holiday money just to watch water freeze.  Plus all the heat and lights you have to have on. I have been there going on my 5th year, and if we had two openings total you would be lucky.  Last year we had one freighter on dec. 2nd, that was it, they get stuck out in the bay.  I love my job and I don't want this to affect it, but it don't make any sense at all, when the City is trying to save money.  On days, Joe L and Jim can open it if need be, just get with Coast Guard and have the ship give a 12 hour notice, like they did in past years, and if need be, call one of us in, with the 12 hour notice we could come in, on call. I don't know for the life of me why they would change it.  It used to be march 15th to dec. 15th and that was to long.  We don't have openings until around the 10th of april, and all pleasure craft are done by say late oct, early nov.  I like anyone like anyone else, but Chris I like to earn in.  This is wasting our money, and I don't like wasting money, yours or mine
> Thanks Ron Klosowski…  If you got time please let me know what you think

Mot for Summ J. Ex. K (sics in original).  The mayor forwarded Klosowski's email to Robert Bellman, the City Manager that same day, who in turn emailed David Harran, Mr. Rytlewski's replacement as Bay City's public work's director. Resp. to Summ. J. Ex. 13 at 4, 12.  Mr. Bellman asked Mr. Harran "could the City achieve these savings if recommendations are implemented?" Resp. to Summ. J. Ex. 12.

The day after Klosowski sent his email to the mayor, November 14, 2012, Ledesma and Mr. Harran visited Klosowski on the bridge. According to Plaintiff, Mr. Harran informed Klosowski that he had good ideas but that it was too late for any changes that year. Mr. Harran also allegedly informed Klosowski that he did not have a problem with the fact that Klosowski went to the mayor, but that Ledesma did.

Some who worked with Klosowski on the bridges also had a problem with Klosowski's email to the mayor.  Numerous fellow bridge tenders became upset that Klosowski was apparently speaking on their behalf.  Mot. for Summ. J. Ex. H.  They also expressed concern that their hours would be reduced and they would potentially have to seek additional employment. *Id*. Some even discussed circulating a petition to remove Klosowski from his bridge tender position. *Id*.

On November 20, 2012 Mr. Harran answered Mr. Bellman's email, explaining that Bay City was required to follow the schedule as specified in the Federal Register, Rules and Regulations, and that the City would be subject to fines and penalties if it was unresponsive to any bridge opening request. Resp. to Summ. J. Ex. 15.  Mr. Harran further informed Mr. Bellman that he had informed Klosowski of these facts the day before. *Id*.

On November 21, 2012, one week after Klosowski emailed the mayor, Ledesma contacted ITH to advise that Klosowski was not being asked back for the 2013 year.  In a report of the call, Carla Sowel stated that Ledesma did not want Klosowski to return for the next season because Klosowski had contacted the mayor regarding the bridge schedule, which Klosowski was only interested in because he did not like working in December.  Mot. for Summ. J. Ex. M. ITH was informed that Ledesma and Mr. Harran had a "fire to put out" because the bridge schedule is ruled by the Coast Guard and the city "could lose control of the bridge" and that

"they are so upset with him for doing this because all he had to do was ask his supervisors about why they run the bridges in December." *Id.* The report also noted that the Mayor was looking into whether the State could take control of the bridges. *Id.*

Meanwhile, Mr. Harran sent a second email to Mr. Bellman on December 1, 2012, noting that the City could save up to $25,000, but could be subject to $25,000 in fines from the Coast Guard. Resp. to Summ. J. Ex. 16. Mr. Harran further noted that he agreed with Mr. Bellman that they should bring the topic of discussion to the forefront, and that they could consider closing the bridges for the months of November and April as well. *Id.*

## C.

Klosowski was apparently not notified that he would not be asked to return for the 2013 season. Instead, in a December 12, 2012 job assignment memorandum, Ledesma stated that all bridge operators, including Klosowski, would be off until April 1, 2013. *See* Resp. to Summ. J. Ex. 23. The memorandum further stated that "[a] Bridge Department staff meeting is scheduled for March 25, 2013 at 8:00 a.m. at the City Service Building (lunch room). <u>All</u> Bridge Personnel are required to attend."

On March 13, 2013 Ms. Sowel documented that she had left a voicemail message for Klosowski to call ITH. Mot. for Summ. J. Ex. M. Klosowski apparently did not return the call, and, pursuant to the December 12, 2012 memorandum, Klosowski reported to the meeting on March 25, 2013. Ledesma then asked Klosowski if he could speak with him outside, and informed Klosowski that he no longer had a job. Klosowski Dep. 294. Klosowski stated that he wanted to talk to Mr. Harran, which Ledesma told him he could not do. *Id.* at 295. Nonetheless, Klosowski went to talk to Mr. Harran, who told Klosowski that he would check into and get back to him. *Id.* Later that day, Ledesma called Klosowski to inform him that he was no longer a

bridge operator because he could not get along with other bridge tenders. *Id*. at 298.  ITH did not

inform Klosowski that he did not have a job until that same day, March 25, 2013.  Mot. for

Summ. J. Ex. M.  Ms. Sowel informed Klosowski that he was not being asked back because

there had been a cut back in hours and Bay City requested people who would be willing to work

fewer hours. *Id*.

Following the end of his bridge tending services to Bay City, Klosowski did not report to

ITH for another assignment. Klosowski Dep. 184-190; Mot. for Summ. J. Ex O.  At the time of

his deposition on June 30, 2014 Klosowski was looking for work, but was not using any

employment agencies to assist him in his search, claiming that he no longer trusted them. *Id*. at

126.

**D.**

Klosowski filed suit against Defendants in Bay County Circuit Court on September 10,

2013, alleging three counts: (1) tortious interference with an advantageous business relationship;

(2) tortious interference with a contractual relationship; and (3) violation of Michigan public

policy and the Michigan Constitution's guarantees of freedom of speech. ECF No. 1. Ex. B.

Klosowski then filed an amended complaint on February 16, 2015, adding a claim that

Defendants violated his right to freedom of speech under 42 U.S.C. § 1983.  Defendants

consequently removed the action to this Court on February 19, 2015.

On November 24, 2016 Defendants moved for summary judgment as to all of Plaintiff's

claims. That motion was granted in part and denied in part on February 24, 2016. *See* Op & Ord.

ECF No. 22.  Plaintiff Klosowski's tort claims and his claim under Michigan public policy and

the Michigan Constitution were dismissed on the merits. *Id*.  With regard to Plaintiff's § 1983

claim, the Court determined that although Plaintiff's First Amendment rights had been violated,

Defendant Ledesma was entitled to qualified immunity. *Id.* Plaintiff's § 1983 claim against Ledesma was therefore dismissed. However, because Defendants did not raise any arguments regarding Plaintiff's First Amendment claim against the city, the Court did not consider whether Plaintiff Klosowski had established a claim under § 1983 against Defendant Bay City.

## II.

Defendant Bay City now moves for summary judgment on Klosowski's remaining claim. A motion for summary judgment should be granted if the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party has the initial burden of identifying where to look in the record for evidence "which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The burden then shifts to the opposing party who must set out specific facts showing "a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (citation omitted).

The Court must view the evidence and draw all reasonable inferences in favor of the non-movant and determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251-52. The party opposing summary judgment "must do more than simply show that there is some metaphysical doubt as to the material facts…. Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

## A.

In *Monell*, the Supreme Court held that municipalities are "persons" subject to suit under 42 U.S.C.A. § 1983. *Monell*, 436 U.S. at 700-01. Such a claim may only be brought when

"execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983." *Id*. at 694.   The Sixth Circuit has instructed that, to satisfy the requirements of *Monell*, a plaintiff "must identify the policy, connect the policy to the city itself and show that the particular injury was incurred because of the execution of that policy." *Garner v. Memphis Police Dept.*, 8 F.3d 358, 364 (6th Cir. 1993) (internal citations and quotations omitted).

Accordingly, to succeed on a *Monell* claim, a plaintiff first must allege that the municipality itself caused a constitutional tort. *Monell*, 436 U.S. 658 at 691.   A municipality cannot be held liable *solely* because it employs a tortfeasor—or, in other words, a municipality cannot be held liable under § 1983 on a respondeat superior theory." *Id*

Second, a Plaintiff must show that the alleged conduct qualifies as a policy.   *Monell* municipal liability may attach where "the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers."   *Id.* at 690.   *Monell* liability may also attach where a plaintiff alleges "constitutional deprivations visited pursuant to governmental 'custom' even though such a custom has not received formal approval through the body's official decisionmaking channels."   *Id*. at 690-91. Municipal liability may also attach for policies promulgated by the official vested with final policymaking authority for the municipality.   *See Miller*, 408 F.3d at 813 (citing *Pembaur v. City of Cincinnati*, 475 U.S. 469, 482–83, 106 (1986). This second element requires a plaintiff to show "a deliberate choice to follow a course of action is made from among various alternatives by the official or officials responsible for establishing

final policy with respect to the subject matter in question." *Pembaur v. City of Cincinnati*, 475 U.S. 469, 483 (1986).

Third, a plaintiff must show causation.  In other words, a plaintiff must connect the municipality's policy to the particular injury alleged.

## B.

In support of its § 1983 claim against Defendant Bay City Plaintiff posits a single theory: that Ledesma was an official vested with final policymaking authority for Defendant Bay City under *Pembaur*, 475 U.S. at 482-83.  In *Pembaur*, the Supreme Court explained that the "official policy" requirement of *Monell* was intended to distinguish acts of the municipality from acts of the municipality's employees. *Id.* at 1297-99.  "Mere authority to exercise discretion while performing particular functions does not make a municipal employee a final policymaker unless the official's decisions are final and unreviewable and are not constrained by the official policies of superior officials.  *Feliciano v. City of Cleveland*, 988 F.2d 649, 655 (6th Cir. 1993). "Officials can derive their authority to make final policy from customs or legislative enactments, or such authority can be delegated to them by other officials who have final policymaking authority." *Id*.  The question of whether a government official is vested with final policymaking authority is a question of state law.  *Pembaur*, 475 U.S. at 483.

Defendant Bay City is governed by Charter, under which nine commissioners and the mayor constitute the city commission.  *See* Charter § 3, ECF No. 30 Ex. D.  "[A]ll powers of the city and the performance of all duties and obligations imposed on the city shall be vested in the commission." *Id*. The Charter also authorizes the commission to appoint a city manager with the following duties, among others: (1) enforce laws, ordinances, and the charter; (2) direct and

supervise the administration of all city offices and departments; (3) appoint, discipline, suspend or terminate city employees; and (5) manage and supervise all bridges  *Id*. § 5.

While Ledesma was indisputably granted the power to make discretionary decisions regarding bridge tender's daily duties and continued employment, Plaintiff has not identified any Michigan law or any provision of Bay City's Charter suggesting that Ledesma – a bridge foreman – was endowed with final authority to establish any employment policies on behalf of Defendant Bay City. Neither has Plaintiff identified any delegation of policymaking authority from a Bay City policymaking official.  The fact that a purported policymaker ratified Ledesma's decision to sever Klosowski's relationship with the City does not establish that Ledesma had final policymaking authority. Instead, Plaintiff's argument in this regard serves only to establish that that Ledesma's decision was neither final nor unreviewable. *See Feliciano*, 988 F.2d at 655. Because Plaintiff has not connected any municipal policy with his alleged injury, his claim against Defendant Bay City will be dismissed.

**III.**

Accordingly, it is **ORDERED** that Defendants' motion for summary judgment, ECF No. 30, is **GRANTED.**

It is further **ORDERED** that count V of Plaintiff Klosowski's complaint, ECF No. 1, is **DISMISSED with prejudice.**

s/Thomas L. Ludington
THOMAS L. LUDINGTON
United States District Judge

Dated: June 10, 2016

- 12 -

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on June 10, 2016.

s/KIM GRIMES_____
Kim Grimes Acting in the Absence of
Michael A. Sian, Case Manager